UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSCAOLA DIVISION

**C.H., a minor, by RUSSELL
HILLIGOSS and TAMMY
HILLIGOSS, his natural guardians,**

    Plaintiff,

v.                                                     CASE NO. 3:18cv2128-MCR-HTC

**THE SCHOOL BOARD OF
OKALOOSA COUNTY, FLORIDA;
MARY BETH JACKSON; STACIE
SMITH; ARDEN FARLEY; ALAN
LAMBERT; JON WILLIAMS; ROY
FRAZIER; and JEAN HENNION,**

    Defendants.
_____/

## ORDER

This matter is before the Court on Defendant Mary Beth Jackson's Motion for Summary Judgment (ECF No. 293). Plaintiff C.H. is a nonverbal, developmentally disabled child who alleges physical and verbal abuse at the hands of Roy Frazier, his exceptional student education (ESE) teacher, and Frazier's aide, Jean Hennion, while enrolled at Silver Sands School in Okaloosa County, Florida (Silver Sands), during the 2014–15 and 2015–16 school years.[1] Jackson was the Superintendent of

---

[1] Silver Sands is part of the Okaloosa County School District (School District). It is a Title I public school that "provides educational services to students who, because of their mental functioning levels, require services beyond those offered by other special educational programs in regular

the School District during that time. Through his parents, Russell and Tammy Hilligoss, C.H. filed the instant action against Frazier, Hennion, the School Board, and five other individual defendants, including Jackson.[2]

Jackson, as well as the other Defendants, previously filed a motion to dismiss (ECF No. 71), which the Court granted in part and denied in part (ECF No. 100). Specifically, with regard to Jackson, the Court dismissed C.H.'s claim for unreasonable seizure but allowed C.H. to proceed with his claims for violation of his

---

schools." www.okaloosaschools.com/silversands. Silver Sands students range in age from three to twenty-two years old. *Id.* Silver Sands is governed and overseen by the Okaloosa County School Board (School Board), which operates, controls, and supervises all schools within the School District, including appointing, suspending, and terminating employees. *See* Fla. Const. Art. IX § 4; Fla. Stat. §§ 1001.32(2), 1001.42, and 1012.22(1). The School Board is responsible for developing and adopting policies and programs governing school operations. *See* Fla. Stat. § 1001.41(1)–(3). The School Board can adopt policies upon the recommendation of, and delegates implementation of its policies to, the Superintendent, who is the secretary and executive officer of the School Board responsible for the administration and management of all schools within the School District and the supervision of instruction. *See* Fla. Stat. §§ 1001.32 and 1001.33; ECF Nos. 298-8 at 2 and 298-9. From 2012 until 2019, the School Board operated approximately forty K-12 schools, including Silver Sands; employed approximately 3,200 individuals; and educated more than 30,000 students each year. As of November 13, 2015, 4,223 students were classified as students with disabilities across all exceptionalities.

[2] C.H. also named as Defendants Stacie Smith, Assistant Superintendent of Human Resources for the School District; Jon Williams, Principal of Silver Sands beginning in February 2016; Alan Lambert, Principal of Silver Sands until February 2016; and Arden Farley, an equity investigator for the School District responsible for investigating claims of misconduct by instructional personnel and school administrators. C.H. settled his claims against Hennion, Lambert, and Farley, and thus those claims were dismissed. *See* ECF Nos. 213, 217, 220, 235, 273, 275, 282. On June 10, 2022, the Court entered orders granting summary judgment in favor of the School Board, Smith, and Williams, *see* ECF Nos. 326, 328, and 331, and denying Frazier's summary judgment motion, *see* ECF No. 330. The Court intended to enter this Order the same day but apparently inadvertently failed to do so.

substantive due process and equal protection rights and conspiracy to interfere with his civil rights. Jackson has moved for summary judgment on those claims. *See* ECF No. 293. Having carefully considered the motion, the record, and the applicable law, the Court finds the motion should be granted.[3]

I.   Background[4]

C.H. was born on September 23, 2002. He suffers from epilepsy, static encephalopathy, ADHD, myotonia, autism, mental retardation, and cognitive impairment. Because of his impairments, C.H. does not understand when he is told to do things and cannot meaningfully communicate with others. He requires constant care, including at school. As a result, C.H. was assigned a one-on-one aide—Warren Pace during the relevant time period; he also was placed on an

---

[3] There are three additional, related suits pending in this Court, which were consolidated with the instant action for purposes of discovery—two suits based on alleged abuse by Frazier and Hennion at Silver Sands, *see N.R. v. Sch. Bd. of Okaloosa Cty., Fla., et al.*, No. 3:18cv2208, and *Van Etten v. Sch. Bd. of Okaloosa Cty., Fla., et al.*, No. 3:19cv82, and a third suit based on allegations that another ESE teacher, Marlynn Stillions, abused a student at Kenwood Elementary School, *see N.P. v. Sch. Bd. of Okaloosa Cty., Fla.*, et al., No. 3:18cv453.

[4] For the limited purpose of summary judgment proceedings, the Court views "the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party"—here, C.H. *Martin v. Brevard Cty. Pub. Sch.*, 543 F.3d 1261, 1265 (11th Cir. 2008) (internal marks omitted).

Page 4 of 20

Individualized Education Plan (IEP).  For the 2014–15 and 2015–16 school years, C.H. was assigned to Frazier's classroom, in which Hennion assisted.

C.H. alleges that Frazier and Hennion physically and verbally abused him, as well as other ESE students at Silver Sands.  In particular, C.H. alleges that throughout the approximate two-year period, Frazier pushed, flicked, and withheld food from him.  C.H. also alleges Frazier regularly strapped him onto a stationary exercise bike, including when his one-on-one aide, Pace, went to lunch or was assisting Frazier with personal matters, and confined him in a cardboard box.[5]  On one occasion, Frazier struck C.H. in the chest with a closed fist so hard that it echoed across the classroom and caused red marks because C.H. was interfering with a personal conversation Frazier was having with a speech pathologist who was in the classroom.  C.H. further contends that Frazier routinely locked him in a hot transport

---

[5] According to Marian Gilmore, a one-one-one aide assigned to another of Frazier's students, N.R., the cardboard box was a refrigerator box, approximately four feet tall, with a lid that was sometimes closed, a practice Gilmore considered unacceptable and abusive.  Gilmore explained that for some ESE kids, confinement is "torture."  ECF No. 298-28 at 62 (the page numbers cited throughout this Order refer to those assigned by the Court's electronic docketing system, as opposed to any other page number that may appear).  Hennion stated in an interview that when C.H. and N.R. wanted out of the box, which required that they turn the box over, Frazier would go over to the box, knock on it, and tell the child inside that he was being too loud and needed to calm down.

Case No. 3:18cv2128-MCR-HTC

van while shopping at yard sales to obtain items for resale—excursions Frazier characterized as "field trips."[6]

Various individuals witnessed Frazier physically and verbally abuse his students, including C.H., and reported the abuse to school officials.  During the 2014–15 school year, Gilmore reported to Lambert that Frazier had confined N.R. in the cardboard box.  On a separate occasion, Gilmore advised Lambert that Frazier brought a bb gun into the classroom.[7]  During the conversation, Gilmore "broke down in tears" and "spilled a lot of things to" Lambert, including that Frazier was still "strapping [N.R.] in the bike chair to keep him from going places."  ECF No. 298-28 at 11.  Gilmore also told Lambert that Hennion, rather than Frazier, was preparing students' IEPs and calling students bad names and that Frazier was flicking students' ears, eating students' food, and going to yard sales while leaving students in the vehicle.  Gilmore believes she also reported to Lambert that Frazier had thrown shoes at students.

---

[6] Frazier sometimes would drop the items off at his home before returning the students to school. At other times, Frazier would take the items to school and give them to Pace to fix in the classroom. Frazier told Silver Sands administration that he took the students on the "field trips" to teach them how to exchange money and count change.  Kelsea Koch, a one-on-one aide in Frazier's classroom for a student identified as "D.M.," however, says that never happened and that Frazier made the students stay on the bus.

[7] Frazier was able to bring the bb gun into the school by concealing it in an umbrella.  He apparently brought it to school and into the classroom so Pace could work on it during the school day.

Page 6 of 20

For the 2015–16 school year, Koch replaced Gilmore in Frazier's classroom. Koch witnessed the incident in which Frazier struck C.H. in the chest. According to Koch, C.H. reacted "bug-eyed, like shocked moment, and then . . . just sat there, you know. Like maybe made like a small sound and just sat quietly." ECF No. 298-27 at 13. Approximately thirty minutes after the incident, Koch reported it to Lambert. Koch met with Lambert for approximately half an hour and advised Lambert, among other things, that he thought Frazier hitting C.H. constituted abuse. According to Koch, it appeared that Lambert was not listening to him and was dismissive of his complaint.[8] Koch testified in his deposition that he left the meeting feeling like "if [Lambert] doesn't think this is abuse, then nothing else that I have seen is ever going to be considered abuse. Because to me, the – the hit to [C.H.] was about as bullyish as it gets. That's hitting a student for making a noise because you can't hear [about] somebody's vacation." ECF No. 298-27 at 30.

Not long after the first meeting, Koch again reported Frazier's abuse to Lambert—to the best of Koch's recollection, because of an incident with D.M. that caused D.M. to defend himself in a violent manner and/or the inappropriate "field

---

[8] Lambert and Frazier had been friends for approximately thirty-five years, having gone to college together and even lived together at one time.

trips."[9]  *Id.* at 18.  After meeting with Lambert, Koch returned to the classroom, where Frazier approached him and asked, "do you really think that's abuse," to which Koch replied, "yes, a hundred percent.  I'm in tears right now.  I think this is abuse."  ECF No. 298-27 at 15.  Koch testified that he explained to Frazier that "[t]his is not touching students to protect them from hurting themselves or others" and was "not a gray area."  *Id.* at 15–16.

Koch believes he met with Lambert a third time regarding Frazier's conduct.  Lambert, however, continued to ignore the reports.  Koch's impression after each meeting was that Lambert wanted him out of his office and to "get him to stop crying and be done with him."  *Id.* at 35.  Following the last meeting, Koch was reassigned to another classroom—in Koch's opinion, in retaliation for reporting Frazier's abuse.

In early February 2016, Williams replaced Lambert as Principal of Silver Sands.  On February 12, 2016, Janalou Mills, a teacher at Silver Sands, was having a conversation with Williams in his office when Frazier's name came up.  Mills advised Williams that Frazier allegedly had punched a student, apparently misidentified as K.S., in the chest and dropped another student on his head.  Mills

---

[9] Koch estimates this second meeting occurred "not too much longer after the first" because "it was pretty much every week [he] could have found an instance of abuse" by Frazier.  *Id.* at 31.

Case No. 3:18cv2128-MCR-HTC

reported what she had been told by Donna Koch, another teacher at Silver Sands, who reported what she had been told by her son, Kelsea Koch.  The same day, Gilmore emailed Williams to report alleged misconduct by another teacher.  She later met with Williams and told him about her experience in Frazier's classroom, including Frazier's inappropriate comments, strapping students to the exercise bike, and bringing a bb gun to school.

After receiving Gilmore's email, Williams spoke to Smith the same day and advised her of the concerns Mills brought to his attention.  Williams also contacted the Florida Department of Children and Families (DCF) and reported that Frazier allegedly punched K.S. in the chest.[10]  Williams identified Kelsea Koch as a witness to the incident.

On February 16, Williams spoke to Richard White, a deputy with the Okaloosa County Sheriff's Office (OCSO).  Williams reported to Deputy White that he had received a report that Frazier struck a thirteen-year-old ESE student, who Williams correctly identified as C.H., in the chest approximately two months earlier.

---

[10] Pursuant to Fla. Stat. § 39.201, any person who knows, or has reasonable cause to suspect, that a child is being abused by a caregiver or person responsible for the child's welfare is obligated to immediately report the abuse to DCF.

According to Deputy White, Williams also reported that he had been informed that Frazier pinched and used pressure point techniques on students.

The same day, Farley visited Silver Sands to investigate the allegations. Williams forwarded Farley the February 12 email from Gilmore. Farley met with Koch, who submitted a handwritten statement describing Frazier's abuse, which he later supplemented with a typewritten statement providing additional details. Gilmore also submitted a written statement detailing Frazier's abuse, which Farley provided to Smith. On February 17, Smith notified Frazier that he had been placed on administrative leave, with pay. After being placed on leave, Frazier emailed Smith inquiring about the procedural requirements. Smith responded by advising Frazier that he was "placed on administration [sic] leave due to the seriousness of the allegations" against him and that placing him on administrative leave was "for the protection of both the students and yourself while this investigation takes place." ECF No. 298-35 at 1.

On February 22, Farley met with Frazier to discuss the allegations against him and allow him an opportunity to respond. Frazier admitted to having inappropriate physical contact with students. When the investigation was complete, Farley prepared a final investigative summary, in which he confirmed "[t]here was sufficient evidence that Respondent Roy Frazier violated the Code of Ethics and

Principles of Professional Conduct." ECF No. 298-37 at 9. Farley recommended that Frazier be disciplined and "evaluated in regards to whether an environment of disable[d] students is where he should work." *Id.* at 10. Farley provided a copy of his report to Smith on March 16, 2016; the OCSO provided a copy of the report to the Florida Department of Education Office of Professional Practice Services.

The day she received the report, Smith sent a letter to Jackson recommending that Frazier receive a three-day suspension for not following a student's Behavior Intervention Plan and not listing all traveled locations on his field trip forms. The next day, Jackson approved the recommendation, which she apparently worked on with Smith, and submitted it to the School Board for approval. Smith and Jackson did not apprise the School Board of the investigation into Frazier; they also did not wait for the School Board's approval before allowing Frazier to return to the classroom.[11] On April 11, 2016, the School Board approved the recommendation and suspended Frazier for three days—which he was allowed to choose over the course of the next thirty days.

---

[11] Pursuant to School Board policy, Jackson was required to immediately report to the School Board any unprofessional conduct by any educator in any manner relating to student discipline, which plainly would encompass Frazier's actions as detailed in Farley's report. Moreover, pursuant to Fla. Stat. § 1012.796(5), when an allegation of teacher misconduct that affects the health, safety, or welfare of a student is received, the superintendent, in consultation with the principal, must, at a minimum, immediately suspend the teacher from regularly assigned duties, with pay, and reassign the teacher to positions that do not require direct contact with students. *Id.*

DCF also investigated Williams' report, interviewing K.S., K.S.'s mother, and Frazier. DCF did not interview Koch, despite the fact that Williams identified him as a witness. K.S. and his mother indicated the allegations were unfounded. Williams did not contact DCF to correct the misidentification because he was unaware it had occurred and also assumed DCF was working with the OCSO. DCF closed its investigation on March 29, 2016, after determining K.S.'s safety was not at risk.

In October 2017, the State Attorney's Office initiated a criminal investigation into the alleged abuse, with which Williams cooperated, including by giving a recorded interview. During the interview, Williams relayed what Mills conveyed to him. The investigation concluded when C.H.'s father, Russell Hilligoss, refused to bring charges because he did not believe the allegations against Frazier. In fact, Hilligoss signed papers agreeing to drop the charges against Frazier after learning that someone he considered reliable had characterized Koch as a trouble maker.

At the time of the interview, which occurred on January 12, 2018, Williams was still unaware he had misidentified the victim when reporting the allegations to DCF. Williams does not recall how he learned the alleged victim of the punch was C.H. and not K.S., and he did not realize he had misidentified the victim until he

obtained a recording of his telephone call to DCF later in 2018 in response to a newspaper report indicating someone had made a false report.

II. Discussion

A. Legal Standard

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, "shows that there is no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Martin v. Brevard Cty. Pub. Sch.*, 543 F.3d 1261, 1265 (11th Cir. 2008). Summary judgment is not appropriate "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995). An issue of fact is "material" if it might affect the outcome of the case under the governing law, and it is "genuine" if the record taken as a whole could lead a rational fact finder to find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) (en banc). The court will not make credibility determinations or weigh the evidence presented on summary judgment. *Frederick v. Sprint/United Mgm't Co.*, 246 F.3d 1305, 1311 (11th Cir. 2001). Whenever sufficient, competent evidence is present to support the

non-moving party's version of the disputed facts, the court will resolve disputes in the non-moving party's favor. *See Pace v. Capobianco*, 283 F.3d 1275, 1276 (11th Cir. 2002).

> B. 42 U.S.C. § 1983—Violation of Substantive Due Process and Equal Protection Rights

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must prove a deprivation of a constitutional or federal statutory right by someone acting under color of state law. *Doe v. Sch. Bd. of Broward Cty., Fla.*, 604 F.3d 1248, 1265 (11th Cir. 2010). C.H. asserts claims against Jackson for violations of his Fourteenth Amendment rights to substantive due process and equal protection of the laws. It is undisputed that Jackson was acting under color of state law with regard to the conduct C.H. alleges—in her capacity as Superintendent of the School District. The only dispute, therefore, is whether C.H. has adduced sufficient evidence to raise a genuine issue of material fact with regard to whether Jackson's conduct deprived him of a constitutional or federal statutory right.

Through his second amended complaint, C.H. seeks to hold Jackson liable in her supervisory capacity for failing to stop or report Frazier's abuse. Supervisory officials cannot be held liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability. *Keating v.*

*City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010). They may be liable, however, for their own misconduct, including where the supervisor "personally participate[d] in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990). The causal connection can be established in several ways. First, a plaintiff can show a "history of widespread abuse"—one so "obvious, flagrant, rampant and of continued duration" that it would have put a "responsible supervisor" on notice of the need to correct the alleged constitutional deprivations and the supervisor failed to do so. *Broward Cty.*, 604 F.3d at 1266 (internal marks omitted). "There is no bright line identifying when misconduct transforms from a couple of 'isolated instances' into a pattern of abuse." *Williams v. Fulton Cty. Sch. Dist.*, 181 F. Supp. 3d 1089, 1122 (N.D. Ga. 2016) (quoting *Broward Cty.*, 604 F.3d at 1266). "One or two incidents of abuse is generally insufficient to indicate a pattern." *Id.*; *see also Broward Cty.*, 604 F.3d at 1266. Alternatively, a plaintiff can establish causation through facts supporting "an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Keating*, 598 F.3d at 762 (internal marks omitted). Finally, the causal connection can be established where the supervisor's "improper custom or policy results in

deliberate indifference to constitutional rights." *Broward Cty.*, 604 F.3d at 1266 (internal marks omitted).

Here, there is no evidence that Jackson had knowledge of Frazier's alleged abuse before Williams reported it to Smith, and, notably, there is no evidence of such abuse after Williams reported it to Smith. There likewise is no evidence that Jackson directed Frazier to abuse C.H., or any other student, or was aware that Frazier would do so and failed to stop him. Finally, there is no evidence of any custom or policy Jackson implemented that led to Frazier's abuse. In fact, as Superintendent, Jackson did not have the authority to adopt policies for or on behalf of the School Board. *See* Fla. Stat. § 1001.49(3). In short, there simply is no evidence that Jackson personally participated in any alleged constitutional violation or establishing a causal connection between Jackson's alleged acts or omissions and any alleged constitutional violation. As such, Jackson cannot be held liable for Frazier's alleged abuse of C.H.

C. 42 U.S.C. §§ 1983 and 1985—Conspiracy to Interfere with Civil Rights

To prove a claim for civil conspiracy under § 1983, a plaintiff must show: (1) a violation of his federal rights under color of state law; (2) an "understanding" among the defendants to violate those rights; and (3) a resultant "actionable wrong." *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1260 (11th Cir. 2010) (internal marks

omitted); *Hadley v. Gutierrez*, 526 F.3d 1324, 1332 (11th Cir. 2008) (stating there must be a causal connection between the conspiracy and the constitutional harm). In contrast, a claim for conspiracy to interfere with civil rights under § 1985(3) requires a showing of: (1) a conspiracy; (2) for the purpose of depriving a person or class of persons of equal protection under the law; (3) an act in furtherance of the conspiracy; and (4) a resultant injury or deprivation of a constitutional right. *Denney v. City of Albany*, 247 F.3d 1172, 1190 (11th Cir. 2001). The primary difference between a § 1985(3) conspiracy claim and its § 1983 counterpart, at least as relevant to this case, is that the second element of a § 1985(3) claim requires proof that a conspirator's action was motivated by a "class-based, invidiously discriminatory animus," whereas § 1983 contains no such requirement. *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971).[12] "[T]he linchpin for [any] conspiracy is agreement, which presupposes communication." *Bailey v. Bd. of Cty. Comm'rs of Alachua Cty.*, 956 F.2d 1112, 1122 (11th Cir. 1992). An agreement, however, may be inferred "from the relationship of the parties, their overt acts and concert of action, and the totality

---

[12] Additionally, § 1983 requires that a defendant have acted under color of state law, while § 1985(3) does not. *Id.* at 99.

Case No. 3:18cv2128-MCR-HTC

of their conduct." *Am. Fed'n of Labor and Congress of Indus. Orgs. v. City of Miami, FL*, 637 F.3d 1178, 1192 (11th Cir. 2011) (internal marks omitted).

Applying these principles, the Court finds insufficient evidence to support a § 1983 or § 1985(3) claim for conspiracy against Jackson. With regard to the § 1983 claim, although the evidence shows C.H. suffered abuse at the hands of Frazier, there is no evidence that Jackson was aware of the abuse before Williams reported it to Smith or that the abuse continued after that. And there is no evidence of any agreement or understanding between Jackson and any other individual to violate C.H.'s rights, or even evidence from which such an agreement could be inferred. The same is true with respect to the § 1985(3) conspiracy claim. Not only is there no evidence implicating Jackson in a conspiracy, but there also is no evidence of Jackson conspiring to act or refrain from acting for the purpose of denying C.H. or any class of persons equal protection under the law. In other words, there is no evidence of discriminatory animus on Jackson's part. C.H. thus has failed to raise a genuine issue of material fact with regard to his conspiracy claims.

D. Qualified Immunity

Even if C.H. had raised a genuine issue of material fact with regard to a claim, Jackson has shown she is entitled to qualified immunity. The affirmative defense of qualified immunity shields public officials performing discretionary functions from

suit in their individual capacities unless their conduct "'violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To receive the benefit of qualified immunity, an official must first show that she was acting within her discretionary authority when the allegedly unlawful acts occurred. *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003). Once this showing is made, the burden shifts to the plaintiff to show that the official is not entitled to qualified immunity. *Id.* at 1358. An official is not entitled to qualified immunity where: (1) her alleged conduct violated a federal statutory or constitutional right; and (2) the right was clearly established at the time of the violation. *Id.* A right is "clearly established" if "it would be clear to a reasonable [public official] that [her] conduct was unlawful in the situation [s]he confronted." *Id.* at 1359. In other words, the state of the law must have provided the official with "'fair warning that [her] alleged [conduct] was unconstitutional.'" *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

In this instance, it cannot be reasonably disputed that the acts forming the basis of C.H.'s claims are discretionary in nature. The burden thus shifts to C.H. to show Jackson is not entitled to qualified immunity. C.H. has failed to do so. Indeed, the Court found no genuine issue of material fact with regard to any of his claims

against Jackson. The Court thus finds that Jackson is entitled to qualified immunity as a matter of law as to each of C.H.'s claims.

> E. Intracorporate Conspiracy Doctrine

Finally, C.H.'s civil conspiracy claims also are barred by the intracorporate conspiracy doctrine, pursuant to which a legal entity—such as the School District or the School Board—"cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000);[13] *see also Denney*, 247 F.3d at 1190. Although there is an exception to the doctrine in "the rare instance" in which corporate employees are shown to have acted for their own personal purposes rather than those of their employer, *see H & B Equip. Co., Inc. v. Int'l Harvester Co.*, 577 F.2d 239, 244 (5th Cir. 1978), C.H. has adduced no such evidence in this case.[14] The Court thus finds that C.H.'s conspiracy claims are barred by the intracorporate conspiracy doctrine.

---

[13] This is because the actions of "corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy." *See id.*

[14] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1991) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

III.   Conclusion

Accordingly, for the reasons set forth above, Defendant Mary Beth Jackson's Motion for Summary Judgment (ECF No. 293) is **GRANTED**.  The Clerk of Court is directed to enter judgment accordingly, tax costs against the Plaintiff, and terminate Jackson from this action.

**DONE AND ORDERED** this 15th day of July 2022.

*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**